## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHARLOTTE BRENT-BELL, | ) | |
| | ) | Case No. 17 C 1099 |
| *Plaintiff,* | ) | |
| | ) | Hon. Joan B. Gottschall, |
| *v.* | ) | District Judge |
| | ) | |
| The CITY OF CHICAGO, Chicago Police | ) | Hon. Jeffrey T. Gilbert, |
| Officers JOSEPH STRUCK, PAMELA | ) | Magistrate Judge |
| CHILDS LAUGHLIN, SHERRY KOTLARZ, | ) | |
| JOSEPH LOPEZ, CYNTHIA R. NICHOLS, | ) | |
| SGT. LOUIS D. BOONE, III, AUDIE | ) | |
| MANAOIS, and UNIDENTIFIED CHICAGO | ) | |
| POLICE OFFICERS, | ) | |
| | ) | JURY TRIAL DEMANDED |
| *Defendants.* | ) | |

## <u>THIRD AMENDED COMPLAINT</u>

NOW COMES Plaintiff, CHARLOTTE BRENT-BELL, by and through her attorneys

LOEVY & LOEVY, and complaining of Defendants CITY OF CHICAGO, Chicago police

officers JOSEPH STRUCK, PAMELA CHILDS LAUGHLIN, SHERRY KOTLARZ, JOSEPH

LOPEZ, CYNTHIA R. NICHOLS, SGT. LOUIS D. BOONE, III, AUDIE MANAOIS and

UNIDENTIFIED CHICAGO POLICE OFFICERS, states as follows:

### INTRODUCTION

1.      On or about August 15, 2016, Defendants removed Plaintiff Charlotte Brent-Bell,

a 68-year-old retiree, from her home on the south side of Chicago for no reason at all. The

Defendants unlawfully arrested her, searched her, detained her at the police station, and

interrogated her.

2.      At no time did Defendants have any reason to suspect Mrs. Brent-Bell of any

crime. Indeed, Defendants all told Mrs. Brent-Bell that she was not suspected of any crime.

3.     During the time that Mrs. Brent-Bell was at the police station, the Defendants knew she was in need of medication. They knew this because Mrs. Brent-Bell told them repeatedly. Nonetheless, Defendants denied Mrs. Brent-Bell timely access to her medication.

4.     As a result of Defendants' unlawful behavior and after hours of interrogation by Defendants, Mrs. Brent-Bell suffered a heart attack while in the custody of the Chicago Police Department. She had to be rushed to the hospital. Her health problems continue to this day.

5.     The violation of Mrs. Brent-Bell's rights and her suffering was caused by the Defendants' illegal conduct and their brazen abuse of power. Mrs. Brent-Bell brings this suit to hold Defendants accountable and to redress the harm that she has suffered and continues to suffer to this day.

## JURISDICTION AND VENUE

6.     This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

7.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331 and 1367.

8.     Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district; all Defendants reside in this judicial district; and the events giving rise to Plaintiff's claims asserted herein all occurred within this judicial district.

## PARTIES

9.     Plaintiff Charlotte Brent-Bell is a 68-year-old resident of Chicago, Illinois. At the time of the events at issue, Mrs. Brent-Bell was detained at her home, in Chicago Police Department vehicles, at the Chicago Police Department station at 5101 S. Wentworth Ave.,

Chicago, Illinois, 60609, and at Mercy Hospital at 2525 S. Michigan Ave., Chicago, Illinois 60616.

10.     Defendants Joseph Struck, Pamela Childs Laughlin, and Audie Manaois are past or current Chicago Police detectives employed by the City of Chicago. Sherry Kotlarz, Joseph Lopez, and Cynthia R. Nichols, are past or current Chicago Police officers employed by the City of Chicago. Sgt. Louis D. Boone, III is a past or current Chicago Police sergeant employed by the City of Chicago. At all times relevant to the events described in this Complaint, these detectives were acting under color of law and within the scope of their employment with the Chicago Police Department.

11.     Defendants Unidentified Chicago Police Officers are unknown employees of the City of Chicago and/or the Chicago Police Department who have not yet been identified by Plaintiff. At all times relevant to the events described in this Complaint, these Unidentified Police Officers were acting under color of law and within the scope of their employment with the Chicago Police Department.

12.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of Defendants Unidentified Chicago Police Officers. The City of Chicago is liable for all torts committed by the Unidentified Chicago Police Detective and Unidentified Chicago Police Officer Defendants while employed by the City of Chicago pursuant to the doctrine of *respondeat superior*. Defendant City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

## FACTS

13.     On or about August 15, 2016, Mrs. Brent-Bell and her husband, Layman Bell, were in their home on the south side of Chicago.

14.     At or about 11:50 a.m., Defendants arrived at her door.

15.     Hearing a forceful knock, Mr. Bell looked out of the window to see who was there. After seeing Defendants, a plain-clothes police detective and a uniformed police officer, Mr. Bell opened the door.

16.     Upon answering the door, one of the officers asked to see Mrs. Brent-Bell. At the time, Mrs. Brent-Bell was upstairs getting dressed, and the Defendants entered the Bells' home.

17.     Mr. Bell asked the officer and detective if they had a warrant, and they responded that they did not need a warrant.

18.     The Defendants told Mr. Bell to go get his wife, and if she did not hurry, they would handcuff her and call a wagon.

19.     When Mrs. Brent-Bell came downstairs, she asked Defendants what they needed to see her about, and they refused to tell her anything.

20.     Mrs. Brent-Bell refused to go with the Defendants and told Mr. Bell to call their lawyer.

21.     The Defendants instructed Mrs. Brent-Bell that she had to come to the police station with them.

22.     Defendants escorted Mrs. Brent-Bell to their police car and put her in the back seat. Defendants told Mr. Bell that they were taking Mrs. Brent-Bell to the station at 51st Street.

23.     On her way out to the police car, Mrs. Brent-Bell suffered an asthma attack and had to use her inhaler.

24.     After entering the police station at 51st street, Defendants took Mrs. Brent-Bell's purse and placed her in an interrogation room.

25.     Mrs. Brent-Bell's cell phone and medications were inside her purse when the Defendants confiscated it without her permission.

26.     Defendants questioned Mrs. Brent-Bell at length.

27.     Defendants searched Mrs. Brent-Bell's cell phone without her permission.

28.     After they had searched through Mrs. Brent-Bell's cell phone, the Defendants presented Mrs. Brent-Bell with a form for her to sign, which purportedly would have given them permission to search her phone. Mrs. Brent-Bell refused to sign the form.

29.     Defendant Officers interrogated Mrs. Brent-Bell for more than six hours.

30.     During the Defendants' interrogation, Mrs. Brent-Bell notified them repeatedly that she needed her purse so that she could take her medications. Defendants delayed Mrs. Brent-Bell's access to her medications.

31.     Mrs. Brent-Bell requested a lawyer numerous times while Defendants were questioning her. Defendants never ceased their questioning in response to Mrs. Brent-Bell's requests for an attorney. Defendants never permitted Mrs. Brent-Bell to speak with an attorney.

32.     Defendants never read Mrs. Brent-Bell her *Miranda* rights. At no point did Mrs. Brent-Bell agree to speak with Defendants. On the contrary, she repeatedly invoked her right to remain silent. Defendants disregarded Mrs. Brent-Bell's invocation of her right to remain silent, and they continued with their questioning.

33.     During the interrogation, Defendants wrote out a statement for Mrs. Brent-Bell to sign. Mrs. Brent-Bell refused to sign the statement.

34.     Throughout the day, Mrs. Brent-Bell began to feel progressively more ill. She told Defendants that she was feeling ill. Mrs. Brent-Bell experienced dizziness, nausea, chest pains, and had become hot and sweaty.

35.    Mrs. Brent-Bell and her husband informed officers that she needed her medication and medical care. Defendants refused to provide her with medication or medical care until hours after she had requested it.

36.    As a result of Defendants' unlawful detention and interrogation, Mrs. Brent-Bell blacked out and became unresponsive. She had suffered a heart attack.

37.    Mrs. Brent-Bell was taken to Mercy Hospital in an ambulance. Defendants followed the ambulance and remained stationed outside of her hospital room.

38.    Mrs. Brent-Bell remained in Defendants' custody. They continued to treat her as a common criminal for absolutely no reason, even after she had suffered a heart attack.

39.    Doctors provided emergency care to Mrs. Brent-Bell, and they thankfully saved her life. Mrs. Brent-Bell had to undergo surgery, and she was hospitalized for four days.

40.    Mrs. Brent-Bell was placed on bed rest for two weeks, and continues to undergo physical therapy.

41.    Following the surgery, Mrs. Brent-Bell was told not to drive and had to hire a home nurse.

42.    As a result of Defendants' misconduct, Mrs. Brent-Bell continues to suffer from nightmares, panic attacks, insomnia, anxiety, and physical pain and suffering.

43.    Mrs. Brent-Bell was never charged with any crime.

44.    Mrs. Brent-Bell was never suspected of any crime.

45.    As described in more detail below, the Defendants' actions and omissions were undertaken pursuant to Defendant City of Chicago's policies, practices, and customs, which were the moving force behind the violations of Mrs. Brent Bell's rights and the cause of her injuries.

As a result of the City of Chicago's policies, practices, and customs, Mrs. Brent-Bell suffered and continues to suffer serious injury.

### COUNT I – 42 U.S.C. § 1983
### Unlawful Arrest and Detention

46.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

47.     In the manner described above, Defendants seized, falsely arrested, and unlawfully detained Mrs. Brent-Bell without probable cause or any lawful justification, in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

48.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Mrs. Brent-Bell's constitutional rights.

49.     As a result of Defendants' misconduct, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

50.     Mrs. Brent-Bell's injuries described in this Count were caused by policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago, as described in Count VI below, the paragraphs of which Plaintiff incorporates as if restated fully herein.

## COUNT II – 42 U.S.C. § 1983
### Unlawful Search

51.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

52.     In the manner described above, Defendants violated Mrs. Brent-Bell's Fourth and Fourteenth Amendment rights by conducting an illegal search of her cell phone without a warrant and without probable cause or any lawful justification.

53.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Mrs. Brent-Bell's constitutional rights.

54.     As a result of Defendants' misconduct, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

55.     Mrs. Brent-Bell's injuries described in this Count were caused by policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago, as described in Count VI below, the paragraphs of which Plaintiff incorporates as if restated fully herein.

## COUNT III – 42 U.S.C § 1983
### Denial of Medical Care

56.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

57.     In the manner described above, Defendants had notice of Mrs. Brent-Bell's serious medical need, and yet they failed to provide her with necessary medical attention, in violation of the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution.

58. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Mrs. Brent-Bell's constitutional rights.

59. Alternatively, Defendants were deliberately indifferent to Mrs. Brent-Bell's objectively serious medical need, and their acts were undertaken intentionally with malice, willfulness, and deliberate indifference to the rights of others.

60. As a result of Defendants' misconduct, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

61. Mrs. Brent-Bell's injuries described in this Count were caused by policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago, as described in Count VI below, the paragraphs of which Plaintiff incorporates as if restated fully herein

## COUNT IV – 42 U.S.C. § 1983
## Conspiracy to Deprive of Constitutional Rights

62. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

63. Defendant Officers, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to deprive Mrs. Brent-Bell of her constitutional rights, all as described in the various paragraphs of this Complaint.

64. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by unlawful means.

65. In furtherance of their conspiracy, each or these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

66.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Mrs. Brent-Bell's constitutional rights.

67.     As a result of Defendants' misconduct, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

68.     Mrs. Brent-Bell's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department, as described above.

## COUNT V – 42 U.S.C. § 1983
## Failure to Intervene

69.     Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

70.     During the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

71.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Mrs. Brent-Bell's constitutional rights.

72.     As a result of Defendants' misconduct described in this Count, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

10

73.     Mrs. Brent-Bell's injuries were caused by employees of the City of Chicago, who acted pursuant to the policies and practices of the Chicago Police Department, as described above.

## COUNT VI – 42 U.S.C. § 1983
### Policies and Practices of the City of Chicago

74.     At all times relevant to the events described in this Complaint, and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures regarding: (a) the arrest, detention, and interrogation of individuals, including witnesses, by the Chicago Police Department; (b) the search of individuals and their property by the Chicago Police Department; and (c) the provision of medication or medical care to individuals with serious medical conditions and/or in need of medical assistance while in the custody of or detained by the Chicago Police Department.

75.     In addition, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of Chicago Police Officers, with respect to: (a) the arrest, detention, and interrogation of individuals, including witnesses, by the Chicago Police Department; (b) the search of individuals and their property by the Chicago Police Department; and (c) the provision of medication or medical care to individuals with serious medical conditions and/or in need of medical assistance while in the custody of or detained by the Chicago Police Department.

76.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by policymaking officials for the City of Chicago and the Chicago Police Department.

77.     These failures to promulgate proper or adequate rules, regulations, policies, and procedures caused routine violations of the constitutional rights of citizens of the City of Chicago, including Mrs. Brent-Bell's constitutional rights.

78.     In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices and customs of Chicago Police Officers under which: (a) individuals not reasonably suspected of any criminal activity, such as Mrs. Brent-Bell, were routinely stopped, seized, arrested, detained, questioned, and/or interrogated against their will; (b) individuals not reasonably suspected of any criminal activity, such as Mrs. Brent-Bell, had their person or property routinely and unlawfully searched; and (c) individuals with serious medical conditions and/or in need of medical assistance did not receive reasonable, adequate, or timely medical care while in the custody of or detained by the Chicago Police Department.

79.     Specifically, Chicago Police Officers routinely stopped, seized, searched, arrested, detained, questioned, and/or interrogated individuals who were not suspected of criminal activity, against their will, by various means, including but not limited to one or more of the following: (a) Chicago Police Officers entered their homes or places of business without a warrant, probable cause, reasonable suspicion, or any other lawful purpose; (b) Chicago Police Officers stopped, seized, arrested, and/or detained them without a warrant, probable cause, reasonable suspicion, or any other lawful purpose; (c) Chicago Police Officers searched their person or property without a warrant, probable cause, reasonable suspicion, or any other lawful purpose; and (d) Chicago Police Officers questioned and/or interrogated them without a warrant, probable cause, reasonable suspicion, or any other lawful purpose, and without proper protection of their constitutional rights to remain silent or to have an attorney present.

80.     For example, in the 1980s, the *Chicago Reporter* found that tens of thousands of citizens were arrested in Chicago neighborhoods in cases that almost never resulted in a conviction because Chicago Police Officers would not show up in court to defend the arrest. The American Civil Liberties Union challenged this pattern and practice of illegal arrests in the lawsuit *Michael Nelson v. City of Chicago*, 83 C 1168 (N.D. Ill.).

81.     In the 1990s, the pattern of illegal seizures continued with the City's so-called "gang loitering ordinance," under which thousands of citizens were arrested and searched without justification. The Supreme Court later declared the practice unconstitutional in *City of Chicago v. Morales*, 527 U.S. 41 (1999).

82.     The U.S. Department of Justice's 2017 report, *Investigation of the Chicago Police Department*, found that a special enforcement unit of Chicago Police officers routinely and improperly stopped and searched black and Latino community members and seized their property.

83.     In the early 2000s, illegal searches and seizures by the Chicago Police Department remained common. In 2003, the American Civil Liberties Union again filed suit, this time on behalf of Olympic Gold medalist Shani Davis and others, alleging illegal searches and seizures by Chicago Police officers. *Davis v. City of Chicago*, 219 F.R.D. 593 (N.D. Ill. 2004) (No. 03 C 2094), 2003 WL 23800673.

84.     Just before Mrs. Brent-Bell's illegal arrest and interrogation, a study of arrests by the American Civil Liberties Union found that there were a quarter million Fourth Amendment seizures in Chicago during the summer of 2014 that did not result in charges. Chicago Police officers conducted half of those seizures without sufficient justification. These seizures occurred disproportionately in African-American communities, such as Mrs. Brent-Bell's.

85.     In April 2016, the Chicago Police Accountability Task Force confirmed that searches and seizures of African-Americans, like Mrs. Brent-Bell, occurred at much higher rates than searches and seizures of the rest of the population.

86.     The examples above demonstrate that the Chicago Police Department's pattern and practice of illegal seizures and searches of Chicago citizens, and particularly African-American citizens, like Mrs. Brent-Bell, is longstanding and widespread.

87.     Many of these illegal seizures have resulted in meritorious lawsuits. Between 2008 and 2016, for example, the City paid judgments and settlements in a minimum of 700 false arrest cases, paying tens of millions of dollars to citizens whose constitutional rights had been violated by Chicago Police officers.

88.     On information and belief, in that time period, approximately 90% of arrests conducted by Chicago Police officers took place without a warrant.

89.     As explained in the Chicago Police Accountability Task Force's recent report, once arrested extremely few Chicagoans are allowed to consult with counsel while in police custody. Instead, Chicago Police officers provide phone access to the outside world for the first time only after interrogations are complete.

90.     For example, in 2014, just three of every 1,000 arrestees in Chicago Police Department custody were permitted to have contact with an attorney.

91.     Between August 2004 and June 2015, approximately 7,000 people were detained in the Homan Square facility and subjected to illegal interrogation.

92.     Recent Chicago history is replete with examples of illegal interrogations that resulted in the violation of the constitutional rights of citizens.

93.     In addition to the above well-documented widespread practices and customs, Chicago Police officers routinely denied adequate medical care to individuals detained at Chicago Police stations who had serious medical conditions and/or a need for medical assistance. Among other things, Chicago Police officers denied medication or medical attention to individuals in custody and failed or refused to respond to detained persons who requested medication or medical attention.

94.     During the time period relevant to this case, approximately 80% of individuals who were detained at a Chicago Police station with a known medical need at the time of arrest received no medical treatment or medication. This is the case even though approximately half of detainees at Chicago Police stations were detained for 8-9 hours and ten percent of detainees were detained longer than 20 hours.

95.     Just before Mrs. Brent-Bell was detained and denied medical care in this case, a federal jury found that the City of Chicago had a widespread practice of denying needed medical attention and medication to detainees in *Ortiz v. City of Chicago*, No. 04 C 7423 (N.D. Ill.).

96.     The violations of Mrs. Brent-Bell's constitutional rights were also caused by the City's failure to adequately train, supervise, and discipline its officers. At all relevant times and for a period of time prior thereto: (a) Chicago Police officers were permitted to stop, seize, search, arrest, detain, question, and/or interrogate individuals without proper training; (b) they did not receive proper training with respect to proper medical care for detained persons who exhibit obvious signs of a serious medical condition or illness; (c) supervisors in the Chicago Police Department with knowledge of what constituted permissible and impermissible stops, seizures, searches, arrests, detentions, interrogations, medical care, and/or medical assistance did not properly supervise or discipline Chicago Police Officers; and (d) employees of the Chicago

Police Department formally and informally adhered to a "code of silence," whereby Chicago Police Officers and their supervisors agreed explicitly and implicitly not to report misconduct committed by employees of the Chicago Police Department, creating an environment of lawlessness, without discipline, where employees of the Chicago Police Department engaged in misconduct without fear of reprisal.

97.     The above persistent and widespread practices and customs are themselves evidence of the City's failure to train, supervise, and discipline Chicago Police officers.

98.     In addition, in March 2015, the American Civil Liberties Union found that Chicago Police officers were hardly ever trained to conduct seizures after their initial training at the police academy. The American Civil Liberties Union also found that there was no evidence that Chicago Police seizures were being supervised by responsible Chicago Police supervisors.

99.     The U.S. Department of Justice's recent report likewise found that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

100.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

101.     The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by City policymakers and Chicago Police officers.

102.     The Mayor of the City of Chicago has acknowledged that a "code of silence" exists within the Chicago Police Department.

103.     In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

104.     In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

105.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

106.     In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

107.    The same code of silence and ineffective system of police oversight were in place when Mrs. Brent-Bell's constitutional rights were violated in August 2016.

108.    Compounding the problem, as the U.S. Department of Justice has found, "Chicago seldom holds officers accountable for misconduct."

109.    Between 2004 and 2016, the City paid more than $500 million to settle or pay judgements in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

110.    The U.S. Department of Justice "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy.  In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

111.    Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

112.    Between 2011 and 2015, nearly half of complaints filed against police officers were not even investigated.

113.    More than 95% of complaints against the police are found to be "unsustained."

114.    Less than 2% of complaints against the Chicago Police resulted in any discipline.

115.    Out of 3,316 recent complaints of false arrest filed against Chicago Police officers, only 20 resulted in any discipline—just slightly more than one half of one percent of cases.

116.     Indeed, in this case itself, the City's police oversight mechanisms have already failed. After Plaintiff filed her Complaint, the City began to investigate the case, reached out to Plaintiff to conduct an interview, at which time Plaintiff's counsel stated that they would make Plaintiff available to answer questions at her deposition. The City's response was to immediately terminate its investigation.

117.     All of the above widespread practices and customs, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged, allowed, acquiesced in, and/or turned a blind eye to the very type of misconduct discussed above, by failing to adequately train, supervise, and control Chicago Police Officers, by failing to promulgate policies, and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses, such as those affecting Mrs. Brent-Bell.

118.     The above-described widespread practices, so well-settled as to constitute *de facto* policy within the Chicago Police Department, were able to exist and thrive because policymakers, acting under color of law with authority over the same, exhibited deliberate indifference to the problem, thereby effectively ratifying it.

119.     In addition and/or alternatively, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Mrs. Brent-Bell were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago, or were actually committed by persons with such final policymaking authority.

120.     Mrs. Brent-Bell's injuries were caused by employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or

19

more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VII – State Law Claim
## False Arrest and Imprisonment

121.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

122.    In the manner described above, Mrs. Brent-Bell was taken into police custody by one or more Defendants, and thereby had her liberty to move about unlawfully restrained, despite Defendant Officers' knowledge that there was no probable cause or other justification for doing so.

123.    In addition, Mrs. Brent-Bell was arrested and unlawfully detained by one or more Defendants without lawful justification.

124.    The actions of the Defendants were undertaken intentionally, with malice and reckless indifference to Mrs. Brent-Bell's rights.

125.    The actions described in this Count were undertaken by Defendants acting within the scope of their employment such that their employer is liable for their actions.

126.    As a result of Defendants' misconduct described in this Count, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

## COUNT VIII – State Law Claim
## Intentional Infliction of Emotional Distress

127.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

20

128.    In the manner described more fully above, the Defendants engaged in extreme and outrageous conduct.

129.    Defendants' actions set forth above were rooted in an abuse of power or authority.

130.    Defendants' actions set forth above were undertaken with intent to inflict severe emotional distress or knowledge that there was a high probability that the conduct would inflict severe emotional distress and with reckless disregard of that probability.

131.    Defendants' actions set forth above were undertaking with malice, willfulness, and reckless indifference to the rights of others.

132.    The actions described in this Count were undertaken by Defendants acting within the scope of their employment such that their employer is liable for their actions.

133.    As a result of Defendants' misconduct described in this Count, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

**COUNT IX – State Law Claim**
**Willful and Wanton Conduct**

134.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

135.    In the manner described more fully above, the actions of Defendants breached the duty of care owed to Mrs. Brent-Bell.

136.    The actions of Defendants were willful and wanton in that they demonstrated an utter indifference for the safety of others. In addition and/or alternatively, Defendants were conscious that an injury could result from the above-described course of action and recklessly disregarded the consequences of those actions.

137.    The misconduct described in this Count was undertaken with intentional disregard for Mrs. Brent-Bell's rights.

138.    As a result of Defendants' misconduct described in this Count, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

## COUNT X – State Law Claim
### Civil Conspiracy

139.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

140.    As described more fully in the preceding paragraphs, Defendants reached an agreement among themselves and with others, known and unknown, to violate the law and deprive Mrs. Brent-Bell of her rights.

141.    In furtherance of the conspiracy, one or more of the co-conspirators committed an overt act and was an otherwise willful participant in joint activity.

142.    The conspiring Defendants' actions were undertaken intentionally, with malice and reckless indifference to Mrs. Brent-Bell's rights.

143.    As a result of Defendants' misconduct described in this Count, Mrs. Brent-Bell experienced and continues to experience pain, suffering, emotional distress, and physical injury, including a heart attack.

## COUNT XI – State Law Claim
### *Respondeat Superior*

144.    Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

145. In committing the acts alleged in this Complaint, Defendants were employees, members, and agents of the Chicago Police Department acting at all relevant times within the scope of their employment.

146. Defendant City of Chicago is liable as principal for all torts committed by its agents.

**COUNT XII – State Law Claim**
**Indemnification**

147. Each of the paragraphs of this Complaint is incorporated as if restated fully herein.

148. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

149. Defendant Officers are, or were, employees of the Chicago Police Department, who acted within the scope of their employment in committing the misconduct described above.

150. The City of Chicago is obligated to pay any judgment entered against the Defendant Officers.

WHEREFORE, Plaintiff CHARLOTTE BRENT-BELL, respectfully requests that this Court enter a judgment in her favor and against Defendants CITY OF CHICAGO, Chicago police officers JOSEPH STRUCK, PAMELA CHILDS LAUGHLIN, SHERRY KOTLARZ, JOSEPH LOPEZ, CYNTHIA R. NICHOLS, SGT. LOUIS D. BOONE, III, AUDIE MANAOIS and UNIDENTIFIED CHICAGO POLICE OFFICERS, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, Charlotte Brent-Bell, hereby demands a trial by jury pursuant to Federal Rule of

Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

**CHARLOTTE BRENT-BELL**

BY:    /s/ Julie M. Goodwin
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steven Art
Julie M. Goodwin
Aisha N. Davis
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Julie Goodwin, an attorney, certify that on April 19, 2018, I caused the foregoing Third
Amended Complaint to be served on all counsel of record via electronic mail.

/s/ Julie M. Goodwin
*One of Plaintiff's Attorneys*