**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CHARLOTTE BRENT-BELL, | |
| Plaintiff, | |
| v. | Case No. 17 C 1099 |
| THE CITY OF CHICAGO, Chicago Police Officers JOSEPH STRUCK, PAMELA CHILDS LAUGHLIN, SHERRY KOTLARZ, JOSEPH LOPEZ, CYNTHIA R. NICHOLS, SGT. LOUIS D. BOONE, III, AUDIE MANAOIS, and Unidentified Chicago Police Officers, | Hon. LaShonda A. Hunt |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

This lawsuit arises out of the arrest of Plaintiff Charlotte Brent-Bell in August 2016. She brings this action under 42 U.S.C. § 1983 against Defendants City of Chicago and several Chicago Police officers for unlawful arrest and detention, improper search of cell phone, failure to provide medical care, failure to intervene, *Monell* liability, and other related state law claims. Before the Court is Defendants' motion for summary judgment on all counts of Plaintiff's complaint except unlawful search as to Defendants Struck and Childs-Laughlin (Count II) and the bifurcated *Monell* claim (Count VI). For the reasons discussed below, Defendants' motion (Dkt. 237) is granted as set forth herein.

## BACKGROUND

The facts are taken from the parties' Local Rule 56.1 statements and undisputed except where noted.[1] On August 15, 2016, Plaintiff, a 68-year old woman with no prior criminal history, was arrested pursuant to 720 ILCS 5/32-4a(a)(2) for allegedly harassing her long time neighbor, Griselda Perry ("Griselda"), and Griselda's friend, Ashley Alexander ("Ashley"). (Dkt. 240-16). Plaintiff had lived next door to Griselda and her husband Keith Perry ("Keith") for about ten years. (Dkt. 240-1 at 68-69). In 2015 and 2016, Keith and Griselda were going through a nasty divorce. (Dkt. 259 at ¶ 2; Dkt. 240-24 at 9). Plaintiff was aware that the police had been to the Perry residence multiple times and arrested Keith based on his interactions with Griselda. (Dkt. 259 at ¶ 4). Plaintiff was acquainted with Keith's mother, Ernestine Perry ("Ms. Perry"); Plaintiff was concerned about Ms. Perry's increased stress over her son's marital problems. (Dkt. 240-1 at 69-70).

### A. Keith's Incarceration and Phone Calls with Plaintiff and Others

In January 2016, Keith was incarcerated at Cook County Jail on domestic battery charges. (Dkt. 259 at ¶ 4; Dkt. 257-4 at 2). In 2016, Defendant Pamela Childs McLaughlin ("Det. Childs") was a detective with the Special Victim's Unit where she handled cases involving domestic violence, child abuse, and elder abuse. (Dkt. 259 at ¶ 6). Defendant Joseph Struck ("Det. Struck") was her partner. (Dkt. 240-3 at 76). Prior to Plaintiff's arrest, both Det. Childs and Det. Struck

---

[1] The Court refers to (a) Dkt. 240—Exhibits to Defendants' Statement of Material Facts; (b) Dkt. 257—Plaintiff's Exhibit List; (c) Dkt. 259—Plaintiff's Response to Defendants' Statement of Material Facts; and (d) Dkt. 281—Defendants' Response to Plaintiff's Statement of Additional Material Facts.

(collectively, the "Detectives") were aware that Griselda had reported multiple incidents of violence and stalking by Keith and his family. (Dkt. 259 at ¶ 28).[2]

Indeed, while Keith was in Cook County Jail, he made several recorded phone calls that the Detectives reviewed before arresting Plaintiff (and Keith) in August 2016. (Dkt. 259 at ¶ 5). In a February 6, 2016 phone call Keith instructed his mother to tell Plaintiff that he was in custody.[3] (*Id.* at ¶ 7). Days later, on February 9, 2016, Keith told his mother to have Plaintiff contact her whenever Plaintiff saw activity at the Perry residence and stated that Plaintiff was his "eyes and ears" while he was in jail. (*Id.* at ¶ 9; Dkt. 240, Ex. 26, 2/9/16 CCDOC phone call at 10:40-11:00, 27:05-27:30).[4] On February 11, 2016, Plaintiff and Keith discussed a time when Plaintiff called Keith to warn him that police were outside his home. (Dkt. 259 at ¶ 10; Dkt. 240, Ex. 26, 2/11/16 CCDOC phone call at 2:00-2:45). In the same call, Keith told Plaintiff to watch Griselda and Ashley to see if one of them looked like they were on drugs. (Dkt. 259 at ¶ 17; Dkt. 240, Ex. 26, 2/11/16 CCDOC phone call at 5:30-6:00).

---

[2] Throughout Plaintiff's response to Defendants' LR 56.1 statement, she objects to certain evidence as constituting inadmissible hearsay. Her assessment is mostly inaccurate, as much of the cited evidence is not being offered to prove the truth of the matter asserted. *See* Fed. R. Evidence 801(c)(2). Rather, Defendants offer these out of court statements by third-party declarants to establish that they had probable cause to arrest Plaintiff. When used to demonstrate what a police officer knew (or reasonably relied on) at the time of the arrest, such statements are not excludable hearsay. *See Cairel v. Alderen*, 821 F.3d 823, 831 (statements made by robbery victims were offered to show the officers had information giving them probable cause to arrest plaintiffs, not to prove they were true). The veracity of the statements told to Defendants and reflected in their arrest report or overheard on recorded jail phone calls does not matter. "Probable cause does not depend on the witness turning out to have been right; it's what the police know, not whether they know the truth that matters." *Kelly v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998).

[3] As already discussed, Plaintiff's objection to the Cook County Jail phone calls as inadmissible hearsay is overruled. Plaintiff further contends that the calls are not relevant because Defendants said they did not base their probable cause determination on them. However, the probable cause test is objective, and the subjective intent or beliefs of the Detectives is not a dispositive factor. *See infra* at Section I. The phone calls are useful to demonstrate all facts available to Defendants at the time of the arrest so that the Court can assess what an objectively reasonable officer equipped with all those facts would conclude. Consequently, the Court overrules the relevance objection.

[4] With respect to certain calls, Plaintiff denied Defendants' description of their content. After listening to the recordings, the Court finds that Defendants accurately described the calls; therefore, Plaintiff's denials will be disregarded. "Rule 56.1 statements that are full of argument, evasion, and improper denials defeat the point of Local Rule 56.1, which is to identify precisely which facts are actually in dispute." *Graham v. City of Niles*, No. 02 C 4405, 2003 WL 22995159, at *1 (N.D. Ill. Dec. 16, 2003).

On April 12, 2016, during another phone call with his mother, Keith asked her if Plaintiff was keeping in touch; Ms. Perry responded affirmatively that Plaintiff was letting her know what was going on. (Dkt. 259 at ¶ 21; Dkt. 240, Ex. 26 4/12/16 CCDOJ phone call at 26:54-27:06). In a call on May 22, 2016, Plaintiff told Keith that if Griselda saw Plaintiff with Ms. Perry, Plaintiff would make noise to show Griselda that Plaintiff would do "anything I can." (Dkt. 259 at ¶ 15; Dkt. 240, Ex. 26, 5/22/16 CCDOC phone call at 20:30-20:40). In June 2016, Keith was released from Cook County Jail and placed on house arrest. (Dkt. 259 at ¶ 25). Keith was prohibited by court order from going to the Perry residence. (*Id.* at ¶ 26).

**B. Griselda's Relocation from the Perry Residence**

While Keith was in custody in early 2016, he allegedly attempted to solicit another inmate to help him hire someone to harm Griselda and Ashley, an accusation Keith denies. (Dkt. 259 at ¶ 24; Dkt. 240-24 at 94). The Detectives were made aware of this threat and other hostile language Keith had directed towards Griselda on recorded jail phone calls. (Dkt. 259 at ¶¶ 18-20, 24). As a result of those threats, Griselda was provided relocation services by the Victim/Witness Advocate Unit ("VWAU") of the State's Attorney's Office. (*Id.* at ¶ 29). "The [VWAU] helps victims or witnesses of violent crimes relocate from one residence to another to hide from their harasser, including being provided an investigator in the State's Attorney's Office to provide security during the move to ensure they are not being followed." (*Id.* at ¶ 30).

On June 29, 2016, Griselda was escorted by Chicago Police officers to the Perry residence to gather some items; Plaintiff was observed watching Griselda with her cell phone. (*Id.* at ¶ 34). Det. Struck included this information in a Case Incident Report dated July 20, 2016.[5] (Dkt. 240-

---

[5] For the reasons stated above at fn.2, the Case Incident Report does not constitute inadmissible hearsay. It is not being offered for the truth of the matter asserted, nor is any statement recorded in it being offered for the truth of the matter asserted. Instead, it is offered to show Defendants' state of mind and reasonable beliefs surrounding probable cause.

4

19). Griselda also advised the Detectives that during a divorce proceeding on July 6, 2016, Keith's divorce attorney reported to the divorce court that Griselda had been seen at the Perry residence. (Dkt. 259 at ¶ 35). In that July 2016 incident report, Det. Struck also noted that Keith's divorce attorney "stated that he had been informed by Keith Perry that [Griselda] was seen at the home by his neighbor and this information was reported to Keith Perry;" the report identifies Plaintiff as the neighbor in question and notes that on the day Griselda was seen by Plaintiff "[Griselda] was under police escort to gather items for herself and others." (Dkt. 240-19).

On August 5, 2016, the VWAU assisted Griselda in relocating from the Perry residence because it was no longer safe for her to remain there. (Dkt. 259 at ¶ 38). Brian Lee and Michael Pagan, investigators with the State's Attorney's Office, "were present as security to ensure no harm came to Griselda Perry during her move." (*Id*. at ¶ 41). While Griselda was moving, Plaintiff called Keith to report the activity occurring at the Perry residence; Keith, in turn, told her to take photographs and to text them to him, which Plaintiff did. (*Id*. at ¶¶ 43-44). Pagan observed Plaintiff on her own property pointing her cell phone in the direction of the Perry residence in a manner that looked like she was documenting the move. (*Id.* at ¶ 45). Griselda went outside, saw Plaintiff was the one taking pictures, and called 911 to report that Plaintiff was photographing her move. (*Id.* at ¶¶ 46, 48).

Two Chicago Police officers responded to the Perry residence and were made aware that Griselda "was the victim of an ongoing domestic investigation and was moving out of her home with the help of two State's Attorney Investigators," but the officers opted to fill out an "informational report," which means that no identification of criminal activity at the time was generated. (Dkt. 281 at ¶¶ 14-15). Griselda also contacted Det. Childs to inform her that Plaintiff was recording Griselda's move; Det. Childs in turn notified Det. Struck. (Dkt. 259 at ¶¶ 49-50.)

Plaintiff took pictures of the Perry residence and Ashley's vehicle at the property and sent them to Keith, including a picture of Ashley's license plate, which Plaintiff understood could be used to track a person. (*Id.* at ¶¶ 51-52).

That same day, Keith filed a verified motion in his divorce proceedings, in which he averred that a "concerned neighbor" took photographs of Griselda moving items from the home and sent the pictures to him. (*Id.* at ¶ 54). The pictures attached to the motion were forwarded to the Detectives. (*Id.* at ¶ 55). Plaintiff disputes whether the photographs sent to the Detectives were the same that Plaintiff had taken and sent to Keith. (Dkt. 259 at ¶ 55; Dkt. 281 at ¶ 24).

### C. <u>Arrests on August 15, 2016</u>

Based on the facts above, the Detectives decided to arrest Plaintiff and Keith for harassment. (Dkt. 259 at ¶ 62). On August 15, 2016, Det. Struck and another officer went to Plaintiff's house and banged on the door while she was getting out of the shower at approximately 11:30 AM. (*Id.* at ¶¶ 65, 68).[6] While her husband spoke to the officers, Plaintiff went to her bedroom and changed her clothes before joining them downstairs. (*Id.* at ¶ 70). She also called Keith to tell him the police were there. (*Id.* at ¶ 69).

The parties dispute whether Det. Struck told Plaintiff she was under arrest or if she was read her *Miranda* rights. (Dkt. 281 at ¶¶ 27, 31). However, Plaintiff testified that Det. Struck said he would "pull her down and call a police wagon and handcuff her" if she did not comply; Plaintiff's husband and Det. Struck testified consistent with Plaintiff's memory of the encounter. (Dkt. 240-1 at 176; Dkt. 240-29 at 56, Dkt. 257-7 at 162, 164). Plaintiff understood that she was not "free to voluntarily choose not to go to the police department." (Dkt. 240-1 at 188).

---

[6] Plaintiff disputes whether the uniformed officer who accompanied Det. Struck that day was Defendant Audie Manaois, but his exact identification is not relevant to this Court's decision, as there was probable cause to support her arrest regardless of who went with Det. Struck to Plaintiff's house that day.

Plaintiff gathered all of the medications she needed for that morning, Det. Struck retrieved Plaintiff's cane from the trunk of her car, and they drove her to the police station. (Dkt. 259 at ¶¶ 71, 74).[7] Plaintiff was not handcuffed. (*Id.* at ¶ 78). When Plaintiff arrived at the station, she was placed in a conference room instead of an interview room. (*Id.* at ¶ 80). Det. Struck told Plaintiff's husband that he could meet them at the police station, so he drove himself there. (*Id.* at ¶¶ 73, 82). Along the way, he called their daughter, Wanda Parker ("Wanda"), and told her that Plaintiff had been arrested. (*Id.* at ¶ 75). When Plaintiff's husband arrived at the station, he was allowed to stay in the conference room with her. (*Id.* at ¶¶ 82, 99).

At the time of her arrest, Plaintiff was prescribed medications for hypertension, diabetes, hyperlipidemia, anxiety, depression, and asthma. (Dkt. 281 at ¶ 53). Plaintiff took her medications twice a day (in the morning and the evening), and typically took her morning medications between 9:00 and 11:00 AM. (Dkt. 259 at ¶ 106). When the officers arrived at her home around 11:30 AM, Plaintiff had yet to take her morning medications, and due to the commotion, she was unable to take them before leaving for the police station with the arresting officers. (*Id.* at ¶¶ 108-109). At the police station, Det. Childs gave Plaintiff her purse so she could take her medication, along with pizza and tea so that she could take them with food. (*Id.* at ¶¶ 110-111). Plaintiff's husband testified that it was approximately 60 to 90 minutes before Plaintiff was allowed to take her medicine and she had to ask several times. (Dkt. 240-29 at 69-70).[8] Plaintiff's husband also stated that he would

---

[7] Plaintiff asserts that she did not bring all her medications for the entire day to the police station, which the Court accepts as true. (*See* Dkt 259 at ¶¶ 71, 109). Even so, Plaintiff does not dispute that she was able to bring her medications for the morning to the station with her, as she testified "I put all the pills that I had to have that morning in my purse." (Dkt. 240-1 at 184).

[8] Plaintiff objected several times to Defendants' statement of material facts because the citation did not support the statement. (*See, e.g.*, Dkt. 259 at ¶¶ 112-114.) It is clear from reviewing the record that Defendants simply miscited the exhibit number for Plaintiff's husband's deposition as Exhibit 21 instead of Exhibit 29. Defendants' recitation of the testimony is accurate. Since Plaintiff did not object to the substance of the facts asserted by Defendants, the Court cites directly to the testimony here.

7

remind Plaintiff to take her nighttime medications when he went to bed, which was around 10:00 or 11:00 PM, and that she would sometimes miss a dose. (Dkt. 240-29 at 45-46).

Plaintiff told the Detectives that she would need her nighttime medications, but they ignored her, did not give it to her, and did not try to get it for her. (Dkt. 259 at ¶ 120). At some time between 7:00 PM and 8:00 PM, Plaintiff's husband alerted Det. Struck that Plaintiff would need her evening medications and asked for someone to drive him home to retrieve them; however, Det. Struck refused to have an officer take him home but did tell him he could go home to retrieve Plaintiff's medications and bring them back to the police station for Plaintiff (as he had driven himself there). (Dkt. 240-29 at 63-64). Plaintiff's husband declined to leave because he was concerned that he would not be able to find Plaintiff if she were moved from the conference room to another location while he was retrieving the medication, and he also observed that Plaintiff appeared to be exhibiting signs of weakness and fatigue. (Dkt. 240-29 at 64-65).

After the Detectives completed Plaintiff's interview in the early afternoon, "Plaintiff had to wait hours until the State's Attorney arrived to conduct interviews." (Dkt. 259 at ¶ 115). Assistant State's Attorney Katheryn Roy ("ASA Roy") interviewed Plaintiff from 7:35 PM to 8:30 PM. (*Id.* at ¶ 118). During that time with ASA Roy, Plaintiff "never made any requests for medication, never complained of being denied medications, did not appear to require any medical attention, did not have any complaints of being mistreated, and never made any complaints regarding Defendants Det. Struck or Childs." (*Id.* at ¶ 119). When the interview ended, Plaintiff sat down in a chair and told Det. Childs that she did not feel well and wanted to go to the hospital. (*Id.* at ¶¶ 129-130).

Plaintiff asserts that she suffered from chest pain, nausea, and sweating during her time at the police station. (Dkt. 281 at ¶ 58). An ambulance was dispatched at 8:49 PM. (Dkt. 259 at ¶

8

134). Plaintiff was taken to Mercy Hospital, where she was diagnosed as having a non-ST-elevation myocardial infarction; she underwent an invasive coronary angiography, which showed blockages in two arteries, and an angioplasty was performed and a stent implanted. (Dkt. 257-8). Plaintiff contends that her heart attack was caused by the stress of her encounter with the police and being unable to take her routine medications. (Dkt. 281 at ¶ 60).

Defendants Sherry Kotlarz and Joseph Lopez located, arrested, and transported Keith to the station at 2:30PM that same day on charges of harassing Griselda. (Dkt. 259 at ¶ 86; Dkt. 240-17). Kotlarz prepared the arrest reports for Plaintiff and Keith. (Dkt. 259 at ¶¶ 86-89). Plaintiff was released from police custody without a charge at 11:16PM. (*Id.* at ¶ 136).

### D. **Procedural History**

Plaintiff's operative Third Amended Complaint (Dkt. 77) asserts the following causes of action: 42 U.S.C. § 1983 Unlawful Arrest and Detention (Count I); 42 U.S.C. § 1983 Unlawful Search (Count II); 42 U.S.C. § 1983 Denial of Medical Care (Count III); 42 U.S.C. § 1983 Conspiracy to Deprive of Constitutional Rights (Count IV); 42 U.S.C. § 1983 Failure to Intervene (Count V); 42 U.S.C. § 1983 *Monell* Claim (Count VI); State Law False Arrest (Count VII); State Law Intentional Infliction of Emotional Distress (Count VIII); State Law Willful and Wanton Conduct (Count IX); State Law Civil Conspiracy (Count X); State Law *Respondeat Superior* (Count XI); and State Law Indemnification (XII).

Defendants moved for summary judgment on all claims except Count II against the Detectives. (Defs. Mem. at 19, Dkt. 241 ("Defendants Det. Struck and Det. Childs assert that they had full consent to review Plaintiff's cell phone but concede that the issue presents a question of fact precluding summary judgment.")). The parties previously agreed to bifurcate Count VI. (Dkt. 203). And in her opposition brief, Plaintiff agreed to dismiss: 1) all claims against Louis D. Boone,

III, Cynthia R. Nichols, and Lopez; and 2) Count II (unlawful search) and Count III (denial of medical care) against Kotlarz and Manaois. The remaining claims at issue, then, are (1) Counts I, III-V, and VII-X against Det. Struck and Det. Childs; and (2) Counts I, IV-V, VII-X against Kotlarz and Manaois, along with Count XI and XII against the City.

## LEGAL STANDARD

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). In determining whether there is a genuine issue of fact, the Court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley v. City of Lafayette Indiana*, 359 F.3d 925, 928 (7th Cir. 2004). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. "The mere existence of a scintilla of evidence in support of the (non-movant's) position will be insufficient; there must be evidence on which the jury could reasonably find for the (non-movant)." *Anderson,* 477 U.S. at 252.

## DISCUSSION

Upon careful consideration of the record and the arguments of the parties, the Court grants Defendants' motion for summary judgment on all claims. Because Count II against the Detectives

will proceed, Count XII remains live to the extent Plaintiff seeks indemnification against the City relating to her claim of unlawful cell phone search only.

## I.     42 U.S.C. § 1983 - Unlawful Arrest and Detention (Count I)

As an initial matter, the Court must determine when the arrest occurred. "An arrest occurs 'when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Tebbens v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012) (quoting *Ochana v. Flores*, 347 F.3d 266, 270 (7th Cir.2003)). In other words, a person is seized within the meaning of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554-555, 100 S. Ct. 1870 (1980). Even "the use of language or tone of voice indicating that compliance with an officer's request might be compelled" may qualify as a seizure under the Fourth Amendment. *Id.* (citations omitted).

Here, there is no genuine dispute that Plaintiff was placed under arrest around 11:30AM on August 15, 2016. Plaintiff, her husband, and Det. Struck all recall Det. Struck telling her that if she did not come with him cooperatively, he would handcuff her and have her taken to the police station in a wagon. Undoubtedly, at that point, a reasonable person would understand that the situation constituted a restraint on freedom of movement consistent with a formal arrest. The fact that the arrest report written approximately five hours later by Kotlarz (who was not involved in Plaintiff's arrest) listed 2:30PM as the time of arrest and included other inaccuracies, does not create a triable issue of fact. The subjective beliefs or understandings of the police officers and the suspect are irrelevant to the nature of detention. *Tebbens*, 692 F.3d at 816. The undisputed facts here demonstrate that, from the moment the police arrived at Plaintiff's door until the time she was

11

released, a reasonable person would have understood that they were not free to leave, and therefore seized for purposes of the Fourth Amendment.

Having determined when Plaintiff was arrested, the Court must next address whether the arrest was lawful. "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citing *Potts v. City of Lafayette*, 121 F.3d 1106, 1113 (7th Cir.1997)). Probable cause deals with probabilities and depends on the totality of the circumstances. *Maryland v. Pringle*, 540 U.S. 366, 370-71, 1254 S. Ct. 795, 800 (2003). It is "a fluid concept" that is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.*, at 243–244, n. 13, 103 S.Ct. at 2317. Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S.320, 338, 134 S.Ct. 1090 (2014).

Probable cause exists "when a reasonable officer with all the knowledge of the on-scene officers would have believed that the suspect committed an offense defined by state law." *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022). The probable cause "inquiry is purely objective, and the officer's subjective state of mind and beliefs are irrelevant." *Johnson v. Myers*, 53 F.4th 1063, 1068 (7th Cir. 2022) (citation and internal quotation marks omitted). Further, we account for the "totality of the circumstances" rather than "dissect[ing] every fact in isolation." *Jump*, 42 F.4th at 789. This is a "common-sense inquiry requiring only a probability of criminal activity"; probable cause exists "whenever an officer ... has enough information to warrant a prudent person to believe criminal conduct has occurred." *Leaver v. Shortess*, 844 F.3d 665, 669 (7th Cir. 2016) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)).

12

Courts look to the requirements of state law to determine whether there was probable cause. *Pourghoraishi v. Flying J. Inc.*, 449 F.3d 751, 761 (7th Cir. 2006). The statute cited by Defendants as the basis for charging Plaintiff, 720 ILCS 5/32-4a(a)(2), provides in relevant part:

> (a) A person who, with intent to harass or annoy one who has served or is serving. . . (2) as a witness, or who may be expected to serve as a witness in a pending legal proceeding, . . . communicates directly or indirectly with the . . . witness or person who may be expected or may have been expected to serve as a witness . . . in such manner as to produce mental anguish or emotional distress or who conveys a threat of injury or damage to the property or person of any . . . witness or person who may be expected or may have been expected to serve as a witness, or family member of the . . . witness or person who may be expected or may have been expected to serve as a witness commits a Class 2 felony.

Viewing the totality of the circumstances, the Court finds no genuine issue of material fact as to whether Defendants had enough information to warrant a prudent person to believe that Plaintiff had violated the statutory provision. Here are the undisputed facts that were known to them before proceeding with the August 15, 2016 arrest: (1) Griselda and Keith had a history of marital strife and were embroiled in contentious divorce proceedings; (2) Keith had been jailed from January 2016 through June 2016 on domestic violence charges involving Griselda; (3) in multiple recorded phone calls from Cook County Jail, Keith asked Plaintiff to watch Griselda and Ashley for him, described Plaintiff as his "eyes and ears," and said she was keeping Keith's mother abreast of the activity at the Perry residence while Keith was in jail; (4) while in custody, Keith made threats against Griselda and allegedly contacted another inmate about murdering Griselda; (5) Plaintiff had reported to Keith that Griselda had been moving items out of the Perry residence in June 2016, and that information was used in the divorce proceedings in July 2016; (6) Plaintiff was observed by Investigator Pagan pointing her cell phone toward the Perry residence during the move on August 5, 2016, in a way that appeared to be taking video of the activities; (7) during that

13

move, investigators for the State's Attorney's Office were visibly present as security; (8) Griselda called 911 and contacted Det. Childs to inform her about Plaintiff's recording, and Det. Childs notified Det. Struck; and (9) Keith had filed a motion in his divorce proceedings that appended photographs apparently taken during the move.

The Court finds that a reasonable officer with this knowledge of the situation would have believed there was a substantial chance of criminal activity by Plaintiff. Indeed, a reasonable police officer may infer intent to harass Griselda from the fact that Plaintiff recorded Griselda's activity on two separate occasions, bragged on a recorded telephone call with an incarcerated Keith that Plaintiff would make noise to show Griselda that Plaintiff would do "anything I can," and then took pictures of the August 5 move despite the presence of investigators there with Griselda.[9] Moreover, it was objectively reasonable to conclude that Griselda may be expected to serve as a witness in her divorce proceedings against Keith, and to believe that pictures taken and information gleaned by Plaintiff was passed to Keith for use in those proceedings. Finally, the fact that Griselda called 911 for help from the Chicago Police and contacted Det. Childs when she became aware that Plaintiff was recording her movements would lead a reasonable officer to believe that indirect communications between Plaintiff and Griselda were done in such manner as to produce mental anguish or emotional distress for a victim who was being relocated with her children due to safety concerns.

In sum, the facts show that a reasonable officer would have believed there was a substantial chance that Plaintiff's activity satisfied all the necessary elements of 720 ILCS 5/32-4a(a)(2). To be clear, this is not to say that Plaintiff committed any crimes. The Court reaches no opinion on

---

[9] "In making probable-cause determinations, law enforcement agents are entitled to draw reasonable inferences from the facts before them, based on their training and experience." *United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003)

whether Plaintiff actually possessed the requisite intent to harass Griselda in connection with the divorce proceedings nor whether Griselda suffered emotional distress due to Plaintiff's actions. However, the Court does believe that the undisputed material facts show that a reasonable police officer would have had probable cause to make an arrest.

This case is similar to *Reher v. Vivo*, 656 F.3d 772 (7th Cir. 2011). There, the plaintiff, after a day of fishing at a local park, sat on a bench for about 30 minutes before being confronted by the mother of his estranged teenaged daughter (who was also at the park that day but whom the plaintiff did not recognize). *Id.* at 774. Plaintiff began videotaping the encounter in case his daughter's mother falsely claimed plaintiff had threatened her; at that point, other people at the park began to angrily approach the plaintiff and accuse him of filming the children in the park. *Id.* The police were called, and when they arrived, they noticed 20 to 25 "visibly upset" residents, many of whom were making comments about children being photographed and sex offenders. *Id.* Plaintiff explained to one of the arresting officers that he simply enjoyed taping nature scenes, but that officer was aware of plaintiff's history with his daughter's mother, including allegations that plaintiff had "kept her under surveillance" as well as a long "history of domestic disputes and violations of orders of protection." *Id.* at 775. When the officer told plaintiff she did not believe his story, he called her a derogatory term and a second officer arrested him for disorderly conduct. *Id.*

Plaintiff sued the officers, arguing that they had arrested him without probable cause. *Id.* The district court granted summary judgment in favor of defendants, and plaintiff appealed; the Seventh Circuit upheld the district court's decision, reasoning that, while there may not have been sufficient evidence to establish probable cause at the site of the arrest, that "it would have been reasonable for an officer with [the first officer's] knowledge of [plaintiff's] turbulent history [with

his daughter's mother] to conclude that [plaintiff] was harassing [them]." *Id.* at 777.[10] Therefore, there was probable cause to arrest.

Other cases in the Seventh Circuit have similarly held that an officer's prior background knowledge can be used to determine that probable cause exists to arrest. *See, e.g.*, *Grimm v. Churchill*, 932 F.2d 674, 675-76 (7th Cir. 1991) (holding that probable cause to arrest for ethnic intimidation existed because officer's brother-in-law told him that arrestee had a history of making racial slurs and officer knew that the bus stop where the intimidation had occurred "had been the scene of racial confrontation in the past"). This case is similar in that Plaintiff's activities on the day in question (*i.e.*, recording Griselda from Plaintiff's own property), standing alone, might not rise to the level of probable cause in a vacuum, but the background information known by Defendants provided them with sufficient information to determine that probable cause existed to arrest Plaintiff.

The Court rejects Plaintiff's arguments as unpersuasive. First, Plaintiff argues that "[n]one of the probable cause identified by the Defendants in their motion, or at any point during discovery as their probable cause facts shifted, justifies a continued detention of Plaintiff on August 15, particularly after Plaintiff was detained and the Defendants started gathering additional information through her interrogation and search of her phone." (Plt. Mem. at 14-15.). This argument misses the mark. Plaintiff acknowledges the relevant inquiry is whether a reasonable person would have believed a crime had been committed given the totality of the circumstances known to the police officer at the time of the arrest. The Court has already found that probable cause existed at 11:30AM when Plaintiff was arrested. Her argument seems to be that every second

---

[10] The Court also held that the second officer who arrested plaintiff after calling the other officer a "bitch" was entitled to qualified immunity, even if probable cause to arrest did not exist based on that officer's knowledge. *Id.* at 777-78.

16

of the continued detention constitutes the "time of the arrest" such that probable cause must be re-evaluated continuously on a rolling basis. But she cites no case law in support of this proposition, and the Court has found none either. Whether Defendants later determined they were wrong (a point Defendants do not concede) is irrelevant to figuring out whether they had probable cause at the time of the arrest.

Next, Plaintiff points out that the narrative in Plaintiff's arrest report does not establish probable cause. Even if Plaintiff is correct, the Fourth Amendment does not require that an arrest report adequately articulate grounds for probable cause. The relevant test mandates a consideration of the totality of circumstances and specifically warns against taking facts in isolation. A less than thorough arrest report that omits crucial facts does not change the constellation of information known to the arresting officers when they arrested Plaintiff. The record clearly demonstrates that Defendants knew significantly more than what is contained in the arrest report and had done several months of investigation before determining they had probable cause to arrest Plaintiff.

Third, Plaintiff makes much of the missing criminal complaints in this case. The Detectives testified that Griselda had signed a criminal complaint against Plaintiff but the documents were destroyed after the police decided they were not going to charge Plaintiff with a crime. (Dkt. 281 at ¶¶ 47-49). Whether such criminal complaints exist is not the salient issue. To the extent Plaintiff contends that destruction of the criminal complaints was improper or that they contained information Plaintiff could have used in this suit, that is a spoliation question that has not been presented to the Court and has no bearing on the question of probable cause. That the complaints may have been subsequently destroyed or even lost does not alter the facts pertaining to the level of detail that was available to the arresting officer when they detained Plaintiff. As the Court has

already explained, Defendants had more than sufficient information to establish probable cause to arrest, with or without a criminal complaint from Griselda.

Even if Defendants are being untruthful and no criminal complaints ever existed, that omission would not alter the analysis. Illinois law or Chicago Police procedures may require a criminal complaint, but Plaintiff's claims are brought pursuant to the rights enumerated in the United States Constitution. *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 434 (7th Cir. 1986). And "[n]o principle of federal law makes a properly attested complaint necessary to an arrest or a criminal prosecution." *Id.*; *see also*, *United States v. Watson*, 423 U.S. 411, 417, 96 S. Ct. 820 (1976) ("The necessary inquiry . . [is] not whether there was a warrant or whether there was time to get one, but whether there was probable cause for the arrest."). Thus, the existence or destruction of criminal complaints is immaterial to whether there was probable cause to arrest Plaintiff.

Plaintiff further argues that Keith's phone calls from Cook County Jail are only "background noise" and should not be considered because Defendants did not rely on them to support the decision to arrest Plaintiff. The Courts rejects that contention. The Fourth Amendment requires the Court to consider all circumstances, and that evidence provides important context about Defendants' understanding of the ongoing surveillance Plaintiff was doing for Keith against his estranged wife. There was a long history of violence inflicted by Keith upon Griselda; he was incarcerated for engaging in such conduct and prohibited from going to their home. His conversations with Plaintiff and others, including the disturbing threats and remarks he made about Griselda, were reason for the heightened attention given to Plaintiff's actions. Keith had Plaintiff as his "eyes and ears" on the activities of his victim, when he could not legally do so himself.

Additionally, even if Defendants did not rely on the phone calls, their subjective intent is irrelevant. *Tebbens*, 692 F.3d at 816. The analysis before the Court is an objective one and

18

examines what a reasonable police officer with Defendants' knowledge would believe. Because Plaintiff does not dispute that Defendants knew about the content of the Cook County Jail phone calls or Keith's domestic issues, this information must be considered when deciding whether probable cause existed at the time of Plaintiff's arrest.

Finally, Plaintiff maintains that taking pictures from your own yard is not a crime, and since the photographs that surfaced at the divorce proceedings were not taken by Plaintiff, they cannot form the basis for probable cause. The Court agrees that merely snapping photos is not criminal activity; but taking pictures or recording others may be criminal when accompanied by other suspicious circumstances. *See Reher*, 656 F.3d at 776 (7th Cir. 2011) ("videotaping other people, when accompanied by other suspicious circumstances, may constitute disorderly conduct."). Here, there were many circumstances and background facts known to Defendants that led them to conclude that Plaintiff was doing more than merely snapping shots from her backyard. Further, even assuming that Plaintiff is correct that the photographs did not come from her phone, that would not matter. Police are allowed to make mistakes in their probable cause findings provided they are reasonable mistakes. *Hughes v. Meyer*, 880 F.2d 967, 969-70 (7th Cir. 1989) (citing *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302 (1949)) (noting the Supreme Court has recognized "the ambiguity of situations with which the police are often confronted, and consequently noted that the rule of probable cause permits mistakes reasonably made").

Defendants had good reason to believe that the photographs had come from Plaintiff—she was seen taking pictures the day of Griselda's relocation and then photos depicting move activities turned up in the divorce proceedings a few days later, after Plaintiff had previously provided information to Keith for his divorce case a month earlier. Even if Defendants were mistaken about

the origin of those photographs, the Court believes those mistakes were reasonable in light of the undisputed facts of this case.[11]

That said, the Court finds it important to note that Defendants could have exercised their discretion more prudently. Their desire to protect a domestic violence victim from harassment is commendable, but Plaintiff was an elderly woman with no prior criminal history who no longer lived near Griselda after the August 5 move. They were unlikely to have any further contact. And Keith, who was already on house arrest, was being arrested the same day, which mitigated somewhat the threat of harm. In all likelihood, "[m]ore courteous and responsible conduct by [Defendants] . . . would probably have avoided the filing of this lawsuit and the needless expenditure of valuable court and [City] resources." *See White v. O'Leary*, 742 F. Supp. 990, 994 (N.D. Ill. 1990). Simply put, it was probably unnecessary to arrest a 68-year old woman and put her through the stress of a 12-hour detention. Nevertheless, that is not the legal question to be decided. Because Defendants had probable cause to arrest Plaintiff for harassment and her arrest does not rise to the level of a constitutional violation, the summary judgment is entered in favor of Defendants on Count I.

## II.     42 U.S.C. § 1983 – Denial of Medical Care (Count III)

The Seventh Circuit has held that an officer violates the Fourth Amendment's prohibition on unreasonable seizures when the officer does not respond reasonably to an arrestee's medical needs. *Florek v. Village of Mundelein*, 649 F.3d 594, 598 (7th Cir. 2011) (citing *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir.2007)). Both sides agree that the appropriate standard

---

[11] Moreover, even if the Court concluded that Defendants lacked probable cause to arrest Plaintiff, it would find that Defendants were protected by qualified immunity. "[O]nly if no reasonable officer could have mistakenly believed that he had probable cause to arrest is [qualified] immunity forfeited." *Wolin v. Gondert*, 192 F.3d 616, 625-26 (7th Cir. 1998) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir.1988)).

under the Fourth Amendment is whether Defendants' actions were "objectively reasonable." (Defs. Mem. at 20; Plt. Resp. at 24). The factors to be considered in determining whether an officer's response to an arrestee's medical needs was reasonable are: "(1) 'notice of the arrestee's medical need ... whether by word ... or through observation of the arrestee's physical symptoms'; (2) 'the seriousness of the medical need'; (3) 'the scope of the requested treatment,' which is balanced against the seriousness of the medical need; and (4) police interests, a factor which 'is wide-ranging in scope and can include administrative, penological, and investigatory concerns.'" *Florek*, 649 F.3d at 600 (citing *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). "Reasonableness in light of the totality of the circumstances remains the constitutional touchstone in this realm." *Florek*, 649 F.3d at 599 (*Lopez v. City of Chicago*, 464 F.3d 711, 718 (7th Cir.2006)).

Regarding the morning medications, the Court finds that the Defendants acted reasonably in waiting until the early afternoon to allow Plaintiff to take her pills. While Defendants were on notice of her need to take medication, the Court finds that no reasonable juror would conclude that a three-hour delay in administering medication here was objectively unreasonable. Plaintiff's medical *conditions* may have been serious, but her medical needs were not immediately pressing. She had daily maintenance medications that she took twice a day, but she concedes she would occasionally forget to take a dose. (Dkt. 240-29 at 45-46). When Plaintiff was arrested around mid-morning, she had not yet taken her morning doses. At the initial arrest, the police had an interest in quickly and efficiently transporting Plaintiff to the station and beginning their interview. It is reasonable that Plaintiff was not allowed to immediately access her medication in the first moments of her encounter with the police. When Plaintiff did have an acute need, she was able to use her asthma inhaler while in the police car. (Dkt. 259 at ¶ 76). By early afternoon, when Plaintiff

did take her morning medications, she was given food and drink too. While it was later than she was accustomed to taking those medications, the Court cannot say that the delay was objectively unreasonable under these circumstances.

Likewise, Defendants' actions with respect to the evening medications were objectively reasonable. Notice was given to Defendants by Plaintiff's husband who warned them that Plaintiff would need her nighttime doses. However, the record reflects that Plaintiff did not typically take the evening medications until closer to bedtime around 10:00 PM or later. As such, at 7:00 PM when Plaintiff's husband notified Defendants about her evening medications, and even at 8:30 PM when Plaintiff's interview with ASA Roy concluded, nothing in the record suggests that Plaintiff's need for her routine medications then was urgent.

Moreover, Defendants advised Plaintiff's husband that he could drive home and bring her medications back to the police station for Plaintiff to take, but he declined to do so, insisting instead that the police drive him, even though he had driven himself to the station. Notably, during the hour Plaintiff spent with ASA Roy that evening, it is undisputed that Plaintiff never made any requests for medication, never complained about being denied medications, and did not appear to require any medical attention. Given the timing of the requests and Defendants' communications with Plaintiff's husband (and their willingness to let Plaintiff have her medications in a timely manner), the Court finds Defendants' actions were objectively reasonable regarding administration of Plaintiff's evening medications. Summary judgment is therefore entered in favor of Defendants on Count III.

### III.    Plaintiff's Remaining Federal Claims (Counts IV and V)

With the exception of Count II for unlawful search of Plaintiff's cell phone against Det. Struck and Det. Childs (where Defendants concede that factual issues exist) and the bifurcated

Count VI *Monell* claim against the City of Chicago, summary judgment is granted in favor of all other Defendants on the remaining federal claims of conspiracy to deprive of constitutional rights (Count IV) and failure to intervene (Count V). Absent an underlying constitutional violation, there can be no conspiracy to deprive Plaintiff of constitutional rights nor any duty to intervene. Summary judgment is therefore entered in favor of Defendants on Count IV and V.

## IV. Plaintiff's State Law Claims (Counts VII-XII)

Lack of probable cause is an element of an Illinois false arrest claim. *Murawski v. Reid*, 375 F. Supp. 3d 998, 1006 (N.D. Ill. 2019) (citing *Stokes v. Bd. of Educ. of the City of Chicago*, 599 F.3d 617, 626 (7th Cir. 2010)). For the reasons discussed above, no reasonable juror could conclude that Defendants lacked probable cause to arrest Plaintiff, and as such, Plaintiff's claim for false arrest also fails. Summary judgment is therefore entered in favor of Defendants on Count VII.

An intentional infliction of emotional distress claim under Illinois law requires: 1) the conduct must be truly extreme and outrageous; 2) the actor must intend to inflict severe emotional distress or know there is a high probability the conduct will cause severe emotional distress; and 3) the conduct must in fact cause severe emotional distress. *See Cairel v. Alderden*, 821 F.3d 823, 835 (7th Cir. 2016) (quoting *Feltmeier v. Feltmeier*, 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 80 (2003)). Here, the conduct from Defendants was not extreme and outrageous. They did not handcuff Plaintiff, they let her have her cane, they allowed her to collect her morning medications to bring to the police station, they put her in a conference room and let her husband stay with her during the interview process, they gave her pizza and tea to take her medications, and Det. Childs gave her coat to Plaintiff when Plaintiff felt cold. No reasonable juror could look at the undisputed

facts of this case and find that Defendants' actions rise to the level of extreme and outrageous. Summary judgment is therefore entered in favor of Defendants on Count VIII.

Similarly, "'willful and wanton' conduct is an element of a cause of action, not a cause of action on its own." *El-Uri v. City of Chicago*, 186 F. Supp. 2d 844, 850 (N.D. Ill. 2002). Because this is not a viable stand-alone claim, summary judgment is entered in favor of Defendants on Count IX.

Finally, "[u]nder Illinois tort law, a civil conspiracy requires '(1) an agreement between two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means; and (2) at least one tortious act by one of the co-conspirators in furtherance of the agreement that caused an injury to the plaintiff.'" *Turner v. Hirschbach Motor Lines*, 854 F.3d 926, 930 (7th Cir. 2017) (*Borsellino v. Goldman Sachs Group, Inc*., 477 F.3d 502, 509 (7th Cir. 2007)). An agreement is "a necessary and important" element of this cause of action. *Id.* Here, Plaintiff has failed to provide any evidence that there was an agreement between any two people to do anything, or that any of the alleged co-conspirators committed tortious acts. As such, summary judgment is entered in favor of Defendants on Count X.

Because Plaintiff's state law claims have all failed, her *respondeat superior* claim against the City (Count XI) cannot move forward.[12] Summary judgment is therefore entered in favor of Defendant on Count XI.

Finally, summary judgment is denied on Plaintiff's indemnification claim (Count XII) but only to the extent of her illegal cell phone search claim (Count II), a point Defendants essentially concede. (*See* Defs. Mem. at 30). Plaintiff may seek indemnification from the City of Chicago if

---

[12] Municipalities cannot be held liable for § 1983 claims under a theory of *respondeat superior*. *Bd. Of Cty. Comm'rs of Bryan Cty.*, 520 U.S. 397, 404, 117 S. Ct. 1382 (1997).

she prevails on that claim. *Turner v. City of Chicago*, No. 12 C 9994, 2013 WL 4052607, at *7 (N.D. Ill. Aug. 12, 2013).

**<u>CONCLUSION</u>**

For all the foregoing reasons, Defendant's motion for summary judgment [237] is granted except on Count II against Defendants Struck and Childs, Count XII against Defendant City of Chicago relating to indemnification for Count II, and Count VI (which has been bifurcated by agreement).

**DATED**: September 17, 2024

**ENTERED**:

LaSHONDA A. HUNT
United States District Judge

25
